**United States District Court**
For the Northern District of California

1

2

3

4

5             IN THE UNITED STATES DISTRICT COURT

6

7            FOR THE NORTHERN DISTRICT OF CALIFORNIA

8    ADOBE SYSTEMS, INC.,

9           Plaintiff,                        No. C 07-00385 JSW

10   v.

11   ST. PAUL FIRE AND MARINE              **ORDER GRANTING IN PART**
     INSURANCE COMPANY,                    **AND DENYING IN PART**
12                                         **DEFENDANT'S MOTION FOR**
            Defendant.                     **SUMMARY JUDGMENT AND**
13                                         **GRANTING PLAINTIFF'S**
                                           **CROSS-MOTION FOR PARTIAL**
14   _____/ **SUMMARY JUDGMENT**

15

16          Now before the Court is the motion for summary judgment filed by Defendant St. Paul

17   Fire and Marine Insurance Company ("St. Paul") and the cross-motion for summary judgment

18   filed by Plaintiff Adobe Systems Incorporated ("Adobe").  Having considered the parties

19   pleadings, the relevant legal authority, and having had the benefit of oral argument, the Court

20   hereby GRANTS IN PART AND DENIES IN PART St. Paul's motion for summary judgment

21   and GRANTS Adobe's cross-motion for partial summary judgment.

22                                   **BACKGROUND**

23          Adobe filed this coverage action to recover defense and indemnity costs under its St.

24   Paul insurance policy, which provides both Commercial General Liability ("CGL") and Errors

25   and Omissions ("E&O") coverage.  Adobe seeks coverage for four separate underlying legal

26   proceedings between Abode and its longstanding licensor, Agfa Monotype Corporation

27   ("Agfa") and International Typeface Corporation ("ITC") (collectively "Agfa/ITC").  The

28   underlying legal disputes concern Agfa/ITC's copyrighted typeface library and the scope of a

     license conferred on Adobe.

1   Adobe licensed Agfa/ITC's copyrighted fonts for use in its Acrobat software package,

2   which allows end-users to view and print portable document format ("PDF") files.  The

3   converted PDF document can be distributed through networks, including the Internet, to

4   recipients who can display and print copies of the documents, so long as the recipients have

5   installed on their computer a program distributed by Adobe called Acrobat Reader.

6   (Declaration of Gail M. Baev ("Baev Decl."), Ex. D at ¶ 17 (Agfa/ITC Complaint filed in

7   Northern District of Illinois, Eastern District).)  Agfa/ITC contended that Acrobat version 5.0,

8   which Adobe began to distribute in March 2001, contained a technology designed to circumvent

9   embedding bits in the fonts and to permit the embedding of Agfa/ITC's fonts in a PDF

10  document in an editable format.  (*Id.* at ¶ 20.)  When Agfa/ITC learned of the circumvention

11  technology, it complained to Adobe and insisted that the technology be removed from

12  subsequent versions of Acrobat 5.0.  (*Id.* at ¶ 21.)  However, many thousands of Acrobat 5.0

13  were marketed and sold prior to removal of the disputed technology.  (*Id.*)

14  **A.    Underlying Actions.**

15  The underlying dispute of whether the activities by Adobe breached the parties'

16  licensing agreement resulted in four separate legal proceedings between Adobe and Agfa/ITC.

17  On September 4, 2002, in anticipation that Agfa/ITC would file suit, Adobe commenced an

18  arbitration in London, England, seeking a declaration of rights under its license agreement

19  ("London Arbitration").  (Baev Decl., Ex. C.)  According to Agfa/ITC's Statement of the Case,

20  Adobe entered into a license agreement with Agfa's predecessor and after multiple requests and

21  refusals for an extended license, Adobe notified Agfa/ITC of its plan to sell Acrobat 5.0 with

22  editing capabilities.  (*Id.* at SP 489-491.)  Agfa/ITC again objected to the proposed production

23  on the ground that such technology would enable end users to infringe or otherwise violate

24  Agfa/ITC's copyright to use its fonts.  (*Id.* at SP 490.)

25  On September 3, 2002, Adobe sued Agfa/ITC in the United States District Court for the

26  Northern District of California for declaratory relief (the "California Declaratory Relief

27

28

1    Action"). (Request for Judicial Notice, Ex. A.)[1] Adobe alleged that it had a reasonable

2    apprehension that Agfa/ITC would assert a variety of claims against it for breach of the license

3    agreement and infringement of copyright. (*Id.*) Adobe sought a declaration that it had not

4    engaged in any unlawful conduct. (*Id.*)

5            On September 5, 2002, Agfa/ITC sued Adobe in the United States Court for the

6    Northern District of Illinois for alleged violation of the Digital Millennium Copyright Act

7    ("DMCA") by distributing Acrobat 5.0 with technology designed to circumvent embedding bits

8    in Agfa/ITC's copyrighted fonts. (Baev Decl., Ex. D.) Agfa/ITC sought a permanent

9    injunction restraining Adobe from further violations of the DMCA, an accounting, statutory

10   damages and attorneys' fees and costs.

11           On November 13, 2002, Agfa/ITC sued Adobe in the United States District Court for the

12   Northern District of Illinois for declaratory relief for breach of the license agreements. (Baev

13   Decl., Ex. E.) The second Illinois action sought a declaration of rights of ownership of the font

14   software for ITC typefaces; alleged breach of contract license agreement scope of use; and

15   alleged breach of contract license agreement editable embedding.

16           The London Arbitration, the California Declaratory Relief Action and the two Illinois

17   actions are referred to herein collectively as the "Underlying Actions."

18       **B.      St. Paul Insurance Policy.**

19           St. Paul issued to Adobe policy number TE09404801, effective from September 15,

20   2001 through September 15, 2002 (the "Policy"). (Baev Decl., Ex. A.) The Policy includes

21   both E&O and CGL coverage forms. E&O coverage is limited to "damages ... for covered loss

22   ... resulting from your products or your work," caused by a "wrongful act" that "results in a

23   claim or suit first made ... while the Policy is in effect." (*Id.* at SP 61.) The phrase "your

24   products" is defined in the Policy to mean "any of the goods or products that are or were

25

26           [1] Although the Court recognizes that the California Declaratory Action was never
     tendered to St. Paul, the Court OVERRULES Adobe's objections to the Request for Judicial
27   Notice of the California Declaratory Relief complaint for the purposes of its existence and
     noting its contents. The complaint is subject to judicial notice pursuant to Federal Rule of
28   Evidence 201. The parties have not briefed, nor has the Court determined the legal effect of
     the fact that the California Declaratory Action was not tendered to St. Paul.

manufactured, sold, handled, distributed, or disposed of by" the insured and includes any express or implied promises regarding the products. (*Id.*)  The phrase "wrongful act" is defined to mean "any error, omission, or negligent act." (*Id.*)  The Policy also defines a "claim or suit" to be either a demand that seeks damages or a civil proceeding that seeks damages. (*Id.* at SP 62.)

The Policy limits when St. Paul considers a claim or suit to be first made or brought: "we'll consider a claim or suit for covered loss that results from your products or your work to be first made or brought on the earliest of the following dates:  The date that [St. Paul] or any protected person receives written notice of the claim. ...[or]  The date that any described individual protected person could reasonably foresee that such claim or suit would be made or brought." (*Id.* at SP 64.)  A "described individual protected person" is further defined as "any of your directors or executive officers" if the insured is a corporation or other organization. (*Id.*)

The Policy also includes several express exclusions which St. Paul contends preclude coverage.  The pertinent exclusions include exclusions for claims for intentionally "wrongful acts," copyright and other intellectual property law violations, and personal and advertising injury.

The Policy limits Commercial General Liability ("CGL") coverage for "personal injury liability" to damages for a "covered personal injury that results from [the insured's] business activities, other than advertising, broadcasting, publishing, or telecasting done by or for [the insured]; and is caused by a personal injury offense committed while this agreement is in effect." (*Id.* at SP 27.)  The Policy defines "personal injury" as an "injury, other than bodily injury, that's caused by a person injury offense." (*Id.*)  The term "personal injury offense" is defined to provide coverage for a set of expressly enumerated offenses, including "libel or slander" or "[m]aking known to any person or organization written or spoken material that disparages the products, work, or completed work of others." (*Id.*)

The Policy contains several exclusions for CGL coverage, including an exclusion that bars any claim for any violations of copyright and intellectual property law rights.  The

United States District Court

For the Northern District of California

exclusion provides that St. Paul will not cover "injury or damage that results from any actual or alleged infringement or violation of any ... copyright [or] other intellectual property rights or laws." (*Id.* at SP 41.)

On October 22, 2003, Adobe's insurance broker sent St. Paul a letter tendering notice of a claim on behalf of Adobe. (Baev Decl., Ex. B.) After acknowledging receipt of the letter and conducting an investigation of the claim, St. Paul sent Adobe a letter denying coverage for the tendered Underlying Actions on multiple grounds. (*Id.*, Ex. H.) Subsequently, Adobe forwarded excerpts from the deposition of Agfa principal, Ira Mirochnick, in which he asserted that Adobe's press release about the then-pending legal actions was disparaging to Agfa/ITC's business reputation. (*Id.*, Exs. I, J; Declaration of Martin H. Myers, Exs. 5,6.) After reconsideration of facts regarding the Mirochnick deposition, St. Paul again denied coverage. (Baev Decl., Exs. L, N.)

On December 8, 2006, Adobe commenced this insurance coverage action in the Superior Court of the State of California for the City and County of San Francisco. On January 19, 2007, St. Paul removed the action to this Court.

St. Paul moves for summary judgment seeking a ruling that St. Paul had no duty to defend or indemnify Adobe in the four separate Underlying Actions between Adobe and Agfa/ITC. In the alternative, St. Paul moves for partial summary judgment on Adobe's claims for breach of the implied covenant of good faith and fair dealing because its coverage position was reasonable as a matter of law and for partial summary judgment on Adobe's claim for punitive damages on the ground that Adobe cannot demonstrate by clear and convincing evidence that St. Paul acted with fraud, oppression or malice. St. Paul also moves for partial summary judgment on Adobe's claims for pre-tender fees and costs, prosecution fees and costs in lawsuits initiated by Adobe, and that St. Paul is entitled to a set-off for defense fees and costs that Adobe recovered from Agfa/ITC in the Underlying Actions.

Adobe opposes St. Paul's motion and separately moves for partial summary judgment, seeking, as to the third cause of action, a declaration that St. Paul owed Adobe a duty to defend

United States District Court

For the Northern District of California

5

in connection with the Underlying Actions and, as to the first cause of action, a ruling that St. Paul breached its duty to defend Adobe in connection with the Underlying Actions.

**ANALYSIS**

**A.    Legal Standard for Motions for Summary Judgment.**

A court may grant summary judgment as to all or a part of a party's claims. Fed. R. Civ. P. 56(a). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). A fact is "material" if the fact may affect the outcome of the case. *Id.* at 248. "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997). A principal purpose of the summary judgment procedure is to identify and dispose of factually unsupported claims. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323-24 (1986). The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Id.* Once the moving party meets this initial burden, the non-moving party must go beyond the pleadings and by its own evidence "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)) (stating that it is not a district court's task to "scour the record in search of a genuine issue of triable fact"). If the non-moving party fails to make this showing, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

**United States District Court**
For the Northern District of California

1

2          **B.       Governing Insurance Coverage Principles.**

3          A liability insurer owes a duty to defend whenever there is a potential for indemnity

4   coverage under the insurance policy.  *See, e.g., Montrose Chem. Corp. v. Superior Court*, 6 Cal.

5   4th 287, 299-300 (1993).  Where any allegation demonstrates a potential for coverage, the

6   insurer must mount and fund the defense of the entire action, including claims for which there is

7   no potential for coverage.  *Buss v. Superior Court*, 16 Cal. 4th 35, 48 (1997).  In order to

8   determine whether an insured has made a claim for covered damages, the court must compare

9   the underlying complaints with the terms of the policy.  *Waller v. Truck Ins. Exch.*, 11 Cal. 4th

10  1, 18 (1995).  If the underlying complaints and any relevant extrinsic evidence submitted by the

11  insured do not demonstrate that the underlying claims seek damages that are potentially covered

12  under the policy, the insurance company has no duty to defend.  *Id.* at 19.

13         To interpret the meaning of the policy language, courts must first look at the written

14  provisions of the policy.  "If the policy language is clear and explicit, it governs. ... When

15  interpreting a policy provision, we must give its terms their ordinary and popular sense, unless

16  used by the parties in a technical sense or a special meaning is given to them by usage."  *Palmer*

17  *v. Truck Ins. Exch.*, 21 Cal. 4th 1109, 1115 (1999) (citations omitted).  In undertaking this

18  analysis, courts must read limitations on coverage narrowly and insuring agreements "broadly

19  so as to afford the greatest possible protection to the insured."  *MacKinnon v. Truck Ins. Exch.*,

20  31 Cal. 4th 635, 648 (2003) (quoting *White v. Western Title Ins. Co.*, 40 Cal. 3d 870, 881

21  (1985)).

22         Policy exclusions are strictly construed, while exceptions to exclusions are broadly

23  construed in favor of the insured.  *MacKinnon v. Truck Ins. Exchange*, 31 Cal. 4th 635, 648

24  (2003); *Aydin Corp. v. First State Ins. Co.,* 18 Cal. 4th 1183, 1192 (1998).  An insurer cannot

25  escape its basic duty to insure by means of an exclusionary clause that is unclear. Any

26  exception to the performance of the basic underlying obligation must be so stated as clearly to

27  apprise the insured of its effect.  *MacKinnon,* 31 Cal. 4th at 648.

28

**United States District Court**
For the Northern District of California

1    A policy provision is ambiguous if it is susceptible to two or more reasonable

2    constructions. *E.M.M.I., Inc. v. Zurich American Ins. Co.*, 32 Cal. 4th 465, 470 (2004).  Any

3    ambiguous terms are interpreted in favor of finding coverage, consistent with the insured's

4    reasonable expectations.  *Id.*  Policy language must be interpreted as a reasonable lay person

5    would read it, not as it might be analyzed by an attorney or insurance professional.  *Id.*; *see also*

6    *Crane v. State Farm Fire & Casualty Co.*, 5 Cal. 3d 112, 115 (1971).  "[W]ords ... are to be

7    understood in their ordinary and popular sense, rather than according to their strict legal

8    meaning" unless used by the parties in that sense.  Cal. Civ. Code  § 1644.

9    Adobe has the initial burden of demonstrating that, interpreting the facts and allegations

10   most favorably to Adobe, construing any ambiguities in the Policy in favor of Adobe and

11   construing exclusions strictly against St. Paul, it is possible that the Policy could potentially

12   cover some damages alleged in any part of the tendered Underlying Actions.  *See Montrose*, 6

13   Cal. 4th at 300.  It is then St. Paul's burden to demonstrate, again construing all ambiguities and

14   restraints on coverage in favor of Adobe, that there was no possibility of coverage for any claim

15   made in the Underlying Actions.  *See id.*

16        **C.        The E&O Coverage May Cover the Underlying Actions.**

17   Because St. Paul cannot meet its burden to demonstrate that, at the time it denied

18   coverage, it had facts and information conclusively demonstrating that there was no potential

19   for coverage under the E&O provision, St. Paul had a duty to defend under the Policy's E&O

20   provision.  *See Montrose Chem.*, 6 Cal. 4th at 299-300.  The alleged damages in the Underlying

21   Actions resulted from Adobe's "work" and "product," that is, they resulted from the production

22   and distribution of Acrobat 5.0 with the circumvention technology.  Further, the underlying

23   allegations were that the damages suffered by Agfa/ITC were caused by "wrongful acts," that is

24   alleged errors in deciding to include the disputed technology.  Although St. Paul contends that

25   the Policy was intended merely to cover claims made by injured consumers of Adobe's

26   products, there is nothing in the plain language of the Policy that precludes coverage for claims

27   made by Adobe's licensor.

28

United States District Court

For the Northern District of California

1

**D.      The CGL Coverage Does Not Cover the Underlying Actions.**

2        Adobe contends that during the deposition of Mr. Mirochnick, a senior vice president

3   with Agfa, he testified that an Adobe press release dated September 3, 2002 regarding the filing

4   of the London Arbitration and the first Illinois complaint disparaged Agfa/ITC's work and

5   damaged its reputation.  Adobe contends that the sworn testimony implied that Agfa might

6   amend their pleadings to assert a claim for defamation.  In a letter dated September 21, 2005,

7   Adobe represented that no further amendments were filed in which defendants in any of the

8   Underlying Actions actually amended their allegations to include a claim for defamation or

9   disparagement.  Because neither defamation nor disparagement were causes of action raised in

10  any of the Underlying Actions against Adobe, there was no claim for which there was a

11  potential for coverage under the Policy pursuant to its CGL coverage provisions.

12       **E.      Exclusions.**

13              **1.      Intentional Acts Exclusion.**

14       The Policy specifically excludes coverage for intentionally wrongful acts.  In that

15  regard, the Policy provides: "We won't cover loss that results from any criminal, dishonest,

16  fraudulent, or other intentionally wrongful act or omission committed by" the insured.  (Baev

17  Decl., Ex. A at SP 71.)

18       The basic allegations in the Underlying Actions are that Adobe met with representatives

19  of Agfa/ITC on April 6, 2000 and notified them of its plan to manufacture and distribute a new

20  version of Acrobat, which was to include technology capable of circumventing embedding bits

21  that would otherwise prevent end-users from using Agfa/ITC's copyrighted fonts to edit

22  documents or create new documents, without first obtaining a license or paying royalties to the

23  copyright holders.  Despite objections from Agfa/ITC, Adobe decided to issue Acrobat 5.0 with

24  the ability to circumvent the copyrighted fonts.  (Baev Decl., Ex. C, SP at 489-490.)  The

25  various lawsuits constituting the Underlying Actions were, St. Paul argues, the result of an

26  intentional business decision made by Adobe.

27       However, St. Paul has not established that the intentional acts exclusion precludes

28  coverage because there is no evidence presented that Adobe subjectively acted with a

United States District Court

For the Northern District of California

1    preconceived design to inflict a specific injury on Afga/ITC or that its conduct was inherently

2    and objectively harmful.  *See Shell Oil Co. v. Winterthur Swiss Ins. Co.*, 12 Cal. App. 4th 715,

3    740-41 (1993) (holding that a "wilful act" means something more than intentionally doing an

4    act constituting ordinary negligence and coverage is precluded for intentional, wrongful acts

5    that are inherently and necessarily harmful).   In a case with a policy with similar language

6    covering damages resulting from an "error, negligent omission or negligent act of the insured,"

7    the court found that the definition of error "encompasses intentional, non-negligent acts like

8    those associated with the breach of contract."  *Continental Casualty Co. v. Cole*, 809 F.2d 891,

9    895, 896 (D.C. Cir. 1987).  Clearly, the very provision of E&O coverage in this Policy

10   contemplated some level of intentionality.  However, the exclusion precludes coverage only

11   when the act is intentionally wrongful, and there is no evidence in the record before the Court

12   from which to infer that the business decision allegedly made by Adobe to include the

13   circumvention technology in its release of Acrobat 5.0 was, at the time it was made,

14   subjectively known to be wrongful.

15          The Court finds that the conduct alleged in the Underlying Actions does not amount to

16   the type considered to be intentional under the intentional acts exclusion as the allegations

17   supporting breach of contract do not amount to subjective intent to inflict injury and are not

18   objectively inherently harmful.  In addition, because the very provision of coverage

19   contemplates some degree of intentional conduct, the Court finds that a narrow reading of the

20   exclusion and a broad reading of the coverage provision, mandate a finding that the exclusion

21   does not preclude coverage in this instance.

22                    **2.      Infringement of Intellectual Property Laws Exclusion.**

23          The E&O policy provides an exclusion for loss that results from "infringement or

24   violation of any copyright; patent; trade dress; trade name; trade secret; trademark; or other

25   intellectual property right or law."  (Baev Decl., Ex. A at SP 41.)  In addition to potentially

26   seeking damages for infringement of intellectual property rights, the Underlying Actions

27   arguably contain allegations for breach of contract.

28

1    Despite the fact that the Policy contains an intellectual property exclusion, there are

2    claims that potentially fall outside of the exclusion and may constitute covered claims.  Because

3    there are breach of contract claims in the Underlying Actions that are not claims for

4    infringement of an intellectual property law, the exclusion does not serve to preclude coverage

5    completely.  *See, e.g., Electronics for Imaging Inc. v. Atlantic Mutual Ins. Co.*, 2006 WL

6    3716481, *5 (N.D. Cal.) (citing *Aetna Casualty & Surety Co. v. Superior Court*, 19 Cal. App.

7    4th 320, 327 (1993); *Downey Venture v. LMI Ins. Co.*, 66 Cal. App. 4th 478, 489 n.6 (1998))

8    (holding that the intellectual property exclusion does not exclude coverage of underlying suit

9    where there are alleged claims in addition to intellectual property claims triggering a duty to

10   defend because there is a potential for coverage).

11        **F.      Timing of Insurance Claim.**

12        The Policy applies only to losses that result from "a claim or suit first made or brought

13   while [the Policy] is in effect."  (Baev Decl., Ex. A at SP 61.)  The Policy period ran from its

14   inception date, September 15, 2001, through September 15, 2002.  Under the terms of the

15   Policy, a claim is first made or brought on the earliest of the following dates: "[t]he date that

16   [St. Paul] or any protected person receives written notice of such claim or suit; [t]he date that

17   [St. Paul] receive[s] written notice from any protected person of a specific wrongful act

18   involving those products or that work; [or t]he date that any described individual protected

19   person could reasonably foresee that such claim or suit would be made or brought."  (*Id.* at SP

20   64.)  The Policy provides a number of factors to evaluate when making the determination of

21   what constitutes a foreseeable claim or suit:

22        We'll consider it reasonable that a described individual protected person could foresee a
         claim or suit that results from your products or your work being made or brought if one
23        of your customers, or any other person or organization, has done any of the following:

24        •    Repeatedly complained to a described individual protected person about one or
              more problems with those products or that work.
25
          •    Sent their attorney and a described individual protected person a copy of one or
26             more of the written complaints about any problem with those products or that
               work. ...
27
          •    Advised a described individual protected person that those products or that work
28             have failed to perform in compliance with any warranty you provided or any
               statement you made. ...

11

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- Threatened to a described individual protected person that it may take legal action against you or any protected person about any problem with those products or that work.

(*Id.*)

A "claim" is defined as "a demand seeking damages" and a "suit" is defined as "a civil proceeding that seeks damages [including] an arbitration proceeding for damages to which the protected person must submit."  (*Id.* at SP 62.)  Further, a "described individual protected person" is defined as "any of your directors or executive officers if you are a corporation or other organization; and your risk manager, or any leader of your legal, finance, risk management, or other department that is responsible for insurance matters."  (*Id.* at SP 64.)

Therefore, according to the express terms of the Policy, a claim is considered first made or brought when Adobe or one of its executives first received a written demand seeking damages or when one of the risk factors, including repeated complaints or threats of legal action is made to a leader of Adobe's legal, finance or risk management departments or to an Adobe director or executive officer.  The first written demand seeking damages was received on May 24, 2002, well within the Policy effective period.  (Declaration of Colleen Pouliot ("Pouliot Decl."), Ex. 1; Declaration of Ian Feinberg, ¶ 3.)

The only remaining issue is whether there were sufficient pre-existing complaints or threats of legal action that were made known to a "designated individual protected person" at Adobe, that is a member of the relevant legal, financial or risk management departments, or a director or officer.  On this issue, the Court finds there are sufficient disputes of fact that it cannot decide the issue as a matter of law.  Adobe has submitted a number of declarations in support of its opposition from leaders of its risk management/insurance and legal departments in which they claim that they did not receive information or communications from Agfa/ITC indicating an incipient lawsuit.  (*See* Pouliot Decl., ¶ 5; Declaration of John Steenman, ¶ 8.) However, St. Paul contends that Agfa/ITC began to object repeatedly to Adobe's plan to manufacture and distribute Acrobat 5.0 with editing capabilities as early as July 14, 1998. (Baev Decl., Ex. C at SP 489-490.)  St. Paul submits evidence that on June 6, 2001, Agfa/ITC sent Adobe a memorandum entitled "Compromise Negotiation Document Under Rule 408 of

12

the Federal Rules of Evidence" for the purpose of a "high level" meeting that was supposed to take place on June 13, 2001. (Baev Decl., Ex. C at SP 424-433.) Also, in a declaration submitted in support of Agfa/ITC's motion to dismiss in the California Declaratory Relief Action, Ira Mirochnick describes a "high level" face-to-face meeting in June 2001 between the underlying parties that included a large number of Adobe executives, including two Vice Presidents, three in-house attorneys, and various product management personnel. (St. Paul Supplemental Request for Judicial Notice, Ex. B at ¶ 14.)  Because there is a dispute of material fact about which Adobe executives had sufficient information under the terms of the Policy to have had notice of the potentially impending lawsuit, the Court cannot determine as a matter of law the timing of when the claim was first made or brought.

> **G.      Possible Limitations of Coverage.**

Although the Court finds that there was a potential for coverage under the E&O provision of the Policy and does not find that any of the exclusions necessarily preclude coverage, and although the Court cannot decide the issue of timeliness of the claim, the Court next addresses the questions raise by St. Paul's motion for partial summary judgment on the limitations of coverage.

> **1.      Pre-Tender Fees and Operation of the Voluntary Payments Provision.**

The Policy coverage is subject to a voluntary payments provision that states "[i]f an accident, error, event, offence, or wrongful act happens that may involve liability protection provided in this policy, [Adobe] must ... [n]ot assume any financial obligation or pay out any money without [St. Paul's] consent." (Baev Decl., Ex. A at SP 24.)  The voluntary payments provision operates to preclude an insured from recovering defense fees and costs that it has incurred prior to the tender of its claim. *Insua v. Scottsdale Ins. Co.*, 104 Cal. App. 4th 737, 743-44 (2002) ("[I]f the insured makes no demand to defend, the no-voluntary-payments provision lawfully precludes recovery of pre-tender costs."); *see also Faust v. The Travelers*, 55 F.3d 471, 472 (9th Cir. 1995) ("California courts have consistently honored [no-]voluntary payment provisions.")  However, disputed issues of fact may arise where the insured is faced

United States District Court

For the Northern District of California

13

United States District Court

For the Northern District of California

1   with a situation requiring an immediate response to protect its legal interests.  *Fiorito v.*

2   *Superior Court*, 226 Cal. App. 3d 433, 438-39 (1990).

3         In this matter, Adobe tendered notice of a claim to St. Paul on October 22, 2003.  (Baev

4   Decl., Ex. B.)  However, the Underlying Actions commenced approximately one year earlier, in

5   September and November 2002.  The record before the Court indicates there are disputed issues

6   of material fact about what Adobe executives knew and when about the impending underlying

7   dispute.  Because the Court cannot find as a matter of law that Adobe knew the dispute with

8   Agfa/ITC would ripen to litigation, the Court may not determine that the pre-tender payment of

9   legal fees and costs was voluntary or were rather incurred due to a required immediate response

10  by Adobe to protect its legal interests.

11        Accordingly, due to the presence of genuine disputes of material fact, the Court

12  DENIES St. Paul's motion for partial summary judgment on the payment of pre-tender fees and

13  costs.

14                      **2.    Prosecution Costs.**

15        St. Paul contends that it owes no duty to provide coverage to prosecute Adobe's

16  affirmative claims.  The Policy provides that St. Paul has "the right and duty to *defend* any

17  protected person against [a claim or suit for covered damages]."  (Baev Decl., Ex. A at SP 28,

18  62 (emphasis added).)  St. Paul argues that the California Declaratory Relief Action as well as

19  the London Arbitration were initiated by Adobe and therefore, it is not obligated to pay defense

20  fees and costs for the prosecution of these actions.

21        However, in this matter, Adobe contends that it initiated the London and California

22  actions as a necessary legal strategy to defend itself against an impending claim from Agfa/ITC.

23  The Court finds persuasive the reasoning in *IBP, Inc. v. National Union Fire Ins. Co. of*

24  *Pittsburg, PA*, which held that even though an insured initiates a lawsuit, that fact does not

25  automatically preclude coverage for defense-type legal fees and expenses where the insured is

26  resisting a contention of liability for damages. 299 F. Supp. 2d 1024, 1031 (D.S.D. 2003)

27  (citing *Simon v. Maryland Cas. Co.*, 353 F.2d 608, 613 (5th Cir. 1965) (holding that sub-

28  contractor insured was entitled to recover legal fees and expenses from insurer for bringing a

United States District Court

For the Northern District of California

1  declaratory judgment action asserting it was not negligent and was entitled to be paid funds

2  withheld by the general contractor, despite a "defense" clause in policy); *Potomac Elec. Power*

3  *Co. v. California Union Ins. Co.,* 777 F. Supp. 980, 984-85 (D.D.C. 1991) (finding that an

4  affirmative suit brought by an insured is not *per se* unrecoverable as a defense cost)).

5        Accordingly, the Court DENIES St. Paul's motion for partial summary judgment on the

6  limitation of coverage based on Adobe's prosecution of its claims in the California Declaratory

7  Action and the London Arbitration.

8                 **3.**       **Set-Off.**

9        The Court finds St. Paul's motion for summary judgment on the set off of monies

10  recovered in the Underlying Actions to be premature.  To the extent St. Paul seeks to have those

11  amounts set off from any final amount owing to Adobe, the Court will address that aspect of the

12  case at such a point when it has been finally determined that St. Paul owed a duty to defend and

13  the amount actually owing.

14                 **4.**       **Bad Faith Claim and Punitive Damages.**

15        The gravamen of a claim for breach of the implied covenant of good faith and fair

16  dealing, which sounds in both contract and tort, is the insurer's refusal, without proper cause, to

17  compensate the insured for a loss covered by the policy.  *Brizuela v. Calfarm Ins. Co.*, 116 Cal.

18  App. 4th 578, 592 (2004) (citing *Hickman v. London Assurance Corp.*, 184 Cal. 524, 533-34

19  (1920)).  Under California law, an insurer may be held liable for breach of the implied covenant

20  when it withholds policy benefits unreasonably or without proper cause.  *California Shoppers,*

21  *Inc. v. Royal Globe Ins. Co.*, 175 Cal. App. 3d 1, 54 (1985).  Even the mistaken or erroneous

22  withholding of policy benefits, if reasonable or based on a legitimate dispute as to the insurer's

23  liability under California law, does not expose the insurer to bad faith liability.  *Tomaselli v.*

24  *Transamerica Ins. Co.*, 25 Cal. App. 4th 1269, 1280-81 (1994).  "It is now settled law in

25  California that an insurer denying or delaying the payment of policy benefits due to the

26  existence of a genuine dispute with its insured as to the existence of coverage liability or the

27  amount of the insured's coverage claim is not liable in bad faith even though it might be liable

28  for breach of contract."  *Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.*, 90

1    Cal. App. 4th 335, 347 (citing *Fraley v. Allstate Ins. Co.*, 81 Cal. App. 4th 1282, 1292 (2000)).

2    If there is a genuine dispute as to whether or not the insurer had a duty to defend or a basis to

3    deny coverage, it is entitled to summary judgment on a bad faith claim. *Chateau Chamberay*,

4    90 Cal. App. 4th at 348 n.7.

5          A claim for punitive damages requires that the insured prove by clear and convincing

6    evidence that the insurer is guilty of malice, oppression or fraud. Cal. Civ. Code § 3294; *Basich*

7    *v. Allstate Ins. Co.*, 87 Cal. App. 4th 1112, 1118-19 (2001). Malice is defined as conduct

8    intended to cause injury or despicable conduct carried on with a willful and conscious disregard

9    of the rights or safety of other. Oppression is defined as despicable conduct which subjects a

10   person to cruel and unjust hardship in conscious disregard of that person's rights. *Id.*

11          The Court finds there is a legitimate dispute as to the legal application of the coverage

12   provisions and the application of the exclusions in the subject policy. Accordingly, the Court

13   GRANTS St. Paul's motion for summary judgment as to Adobe's claim for bad faith.

14   Furthermore, there is no clear and convincing evidence in the record demonstrating that St. Paul

15   acted with oppression, fraud or malice in denying coverage. Therefore, the Court GRANTS

16   summary judgment as to Adobe's prayer for punitive damages. *See* Cal. Civ. Code § 3294;

17   *Basich v. Allstate Ins. Co.*, 87 Cal. App. 4th 1112, 1118-1121 (2001).

18                                   **CONCLUSION**

19          For the foregoing reasons, the Court DENIES IN PART AND GRANTS IN PART St.

20   Paul's motion for summary judgment. The Court DENIES St. Paul's motion for summary

21   judgment seeking a ruling that St. Paul had no duty to defend or indemnify Adobe in four

22   separate Underlying Actions between Adobe and Agfa/ITC. However, the Court GRANTS St.

23   Paul's motion for partial summary judgment on Adobe's claims for breach of the implied

24   covenant of good faith and fair dealing and for partial summary judgment on Adobe's claim for

25   punitive damages. The Court DENIES St. Paul's motion for partial summary judgment on

26   Adobe's claims for pre-tender fees and costs and prosecution fees and costs in lawsuits initiated

27   by Adobe.

28

1        The Court GRANTS Adobe's motion for partial summary judgment, seeking, as to the

2  third cause of action, a declaration that St. Paul owed Adobe a duty to defend in connection

3  with the Underlying Actions and, as to the first cause of action, a ruling that St. Paul breached

4  its duty to defend Adobe in connection with the Underlying Actions.

5

6        **IT IS SO ORDERED.**

7  Dated:   November 5, 2007

8                                                    JEFFREY S. WHITE
                                                     UNITED STATES DISTRICT JUDGE

9

**United States District Court**
For the Northern District of California

17